UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

JUDY MULLENIX,                    )
                                  )
            Plaintiff,            )
                                  )
v.                                )          No. 2:16-cv-04
                                  )          Judge Phillips
EASTMAN CHEMICAL COMPANY,         )
                                  )
            Defendant.            )

## MEMORANDUM OPINION

Plaintiff Judy Mullenix worked for defendant Eastman Chemical Company at its Kingsport, Tennessee facility for over 24 years. In October 2012, she suffered a broken right arm in a workplace accident. One year and two surgeries later, plaintiff continued to have some physical restrictions and she was terminated. Plaintiff claims her termination was discriminatory in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.

Eastman has filed a motion for summary judgment [Doc. 13], with supporting briefs, affidavits and exhibits [Docs. 14, 15, 16, 17, 26], and the plaintiff has responded in opposition [Docs. 21, 22, 23]. Eastman has also moved to strike plaintiff's affidavit [Docs. 25, 26] and plaintiff has responded [Doc. 27]. After careful consideration of the pending motions and all related pleadings, the defendant's motion to strike will be **DENIED** and the motion for summary judgment will be **GRANTED in part and DENIED in part**.

## I.    Relevant Facts

Ms. Mullenix began working for Eastman on March 6, 1989 [Doc. 14-1 at p. 4]. In 2000, she began working as a First Operator in the Film Esters Department [*Id*. at p. 5]. During the time period pertinent to this case, plaintiff reported to Randy Britton, Principal Team Manager, who reported to Brian McCloud, the Area Manager of Film Esters [*Id*. at pp. 10—11].

The Film Esters Department chemically creates plastic pellets that Eastman's customers can use to create a thin layer of plastic film for products such as LCD televisions [Doc. 15 at ¶ 3]. This is a multi-phase process in which cellulose rolls are reacted with chemicals to create "dope" that is then processed into plastic pellets and packaged for the customer [*Id*.]. This process involves a significant amount of manual labor by the First Operators [*Id*.].

The Film Esters Department operates with four different crews that work 12-hour rotating shifts [*Id*. at ¶ 4]. During the time relevant to this case, plaintiff worked on Crew 3, which included one or two Utility Operators and six First Operators, including plaintiff [*Id*.]. The Utility Operator supports the Principal Team Manager and performs responsibilities such as scheduling, time entry, safety procedures, and other tasks [*Id*. at ¶ 5]. Eastman considers it critical that a Utility Operator be free to address the myriad issues that might arise during a shift [*Id*.]. Thus, while a Utility Operator may occasionally fill-in for or assist a First Operator, they could not consistently fulfill the essential duties of a First Operator [*Id*.].

First Operators in Film Esters are required to be certified and trained on at least three of the First Operator rotations to ensure coverage within the area in the event of absences for vacation, sick leave, etc. [*Id.* at ¶ 6]. During 2012 – 2013, the rotations in Film Esters included the following: Activation, Acetylation Control Room, Acetylation Field Operator, Precipitation, Wash Room, and Dryer & Water Softener [*Id.*]. The First Operator performing the Field Operator rotation during a shift was required to fill in for the Activation Operator, as needed, for meal and rest breaks [*Id.* at ¶ 9].[1] The Acetylation Control Room rotation primarily involved working with computers as the First Operator would control and monitor the process [*Id.* at ¶ 10].

On October 22, 2012, plaintiff tripped and fell at work and landed on her right shoulder, breaking her arm [Doc. 14-1 at pp. 37—38]. The injury required surgery and plaintiff was out of work on Workers' Compensation leave from October 23, 2012 through March 14, 2013 [Doc. 16 at ¶ 5]. Plaintiff returned to work on March 24, 2013, but was out again on Workers' Compensation leave for a second surgery from April 26, 2013, through May 20, 2013 [*Id.*].

Per Eastman policy, when an employee returns to work with medical restrictions, her supervisors are not privy to her medical records [Doc. 15 at ¶ 12]. The Eastman Medical Department receives and reviews all medical documentation and restrictions from an employee's treating physicians and communicates with the employee's line

---

[1]Eastman claims that in 2013, the Activation rotation was filled by a First Operator, but it was anticipated that this rotation would eventually be filled by entry-level workers [Doc. 15 at ¶ 8]. Plaintiff and her former colleague, Sheree Anderson, claim that by the Fall of 2013, only entry-level employees were assigned to the Activation area [Doc. 22 at ¶ 13; Doc. 23 at ¶ 53].

management and Human Resources regarding any restrictions that are in place for purposes of determining whether the restrictions can be accommodated and the employee can be returned to work at that time [*Id.*; Doc. 16 at ¶ 3]. The Medical Department does not provide any medical information to line management – it simply advises them of the applicable restrictions [*Id.*].

According to Eastman's Activity Restrictions and Accommodations Evaluation policy, an employee's temporary activity restrictions can be temporarily accommodated with light duty assignments for up to four months, where such activity restrictions can be accommodated and light duty assignments are available [Doc. 16 at ¶ 4, Ex. 1]. If an employee's temporary activity restrictions require light duty work in excess of this four-month period, one of two things may happen. First, there may be an assessment to determine whether the activity restrictions can be reasonably accommodated in order for the employee to perform his/her essential job functions. Unlike light duty assignments that may be available during the four-month period covered by Eastman's policy, this process considers longer term reasonable accommodations. If the activity restrictions cannot be accommodated, the employee may be placed on a leave of absence, utilizing available short term disability ("STD") benefits, vacation, or other leave benefits. If that option is not available (for example, if the employee has already exhausted his/her available leave), the employee may apply for long term disability benefits ("LTD") and their employment will be administratively terminated once all STD benefits, vacation, or other leave options have been exhausted [*Id.*].

The policy of accommodating temporary activity restrictions for four months typically applies on a continuous, calendar basis [Doc. 16 at ¶ 7]. In other words, an employee may be provided with light duty work to accommodate temporary activity restrictions for a continuous four-month period [*Id.*]. According to this policy, since plaintiff first returned to work on March 24, 2013, in a light duty capacity due to her temporary restrictions, her four-month period of light duty work should have expired on July 24, 2013 [*Id.*]. However, upon consideration of the fact that plaintiff was unable to actually work during part of that period, Eastman recalculated the four-month period after plaintiff returned from her second surgery in May 2013 with temporary activity restrictions and did not count the time that plaintiff was off work for vacation or other leave. Thus, plaintiff's four-month period of light duty work was set to expire on October 11, 2013 [*Id.*].

When plaintiff returned to work on March 24, 2013, Eastman Medical provided Mr. McCloud the following information regarding her temporary activity restrictions: no lifting above 2 pounds with right arm (including above and below shoulder level), no ladder climbing, reaching above shoulder level only occasionally, and no forceful grasping with her right hand [Doc. 15 at ¶ 13]. Because these were temporary restrictions, Eastman determined that it could temporarily accommodate those restrictions by limiting plaintiff's assigned work solely to the Acetylation Control Room rotation and having the other crew members perform all other crew assignments [Doc. 15 at ¶ 13].

On April 24, 2013, plaintiff had a second surgery on her arm [Doc. 14-1 at p. 14]. She was released to return to work effective May 24, 2013, with the following temporary restrictions: no lifting above 2 pounds, no ladder climbing, reaching above shoulder level

5

only occasionally with her right arm, and no forceful grasping with her right hand [Doc. 15 at ¶ 14]. As previously, Eastman determined that it could temporarily accommodate these restrictions by limiting plaintiff's assigned work solely to the Acetylation Control Room rotation and having other crew members perform all other crew assignments [*Id.*]. Plaintiff states she could perform all the duties of the Control Room position by using both arms for activities below shoulder-level and her left arm for any work above shoulder level [Doc. 23 at ¶ 9].

On June 17, 2013, plaintiff's temporary restrictions were modified as follows: no lifting above 5 pounds, no ladder climbing, reaching above shoulder level only occasionally with her right arm, and no forceful grasping with her right hand [Doc. 15 at ¶ 15]. Eastman continued to accommodate these restrictions by limiting plaintiff's assigned work solely to the Acetylation Control Room rotation and having other crew members perform all other crew assignments [*Id.*].

Plaintiff learned in July 2013 that she had a four-month limit on working with restrictions and that her "time was almost up" [Doc. 14-1 at p. 13]. She was off work on unrelated medical leave from August 8, 2013 through September 17, 2013 [*Id.* at p. 14].[2]

On September 16, 2013, plaintiff's temporary restrictions were modified again to the following: no lifting above 10 pounds, no ladder climbing, and reaching above shoulder level only occasionally with her right arm [Doc. 15 at ¶ 16]. Eastman continued

---

[2]At another point in her deposition, plaintiff testified that she was off work until September 19, 2013 [Doc. 14-1 at p. 26]. This distinction is not material for purposes of the summary judgment motion.

to accommodate plaintiff's restrictions in the same manner [*Id*.]. At some point in September, plaintiff went to her doctor to try and get her restrictions lifted, but he refused to do so [*Id*. at pp. 26—27]. She also claims Mr. McCloud told her to check Eastman's "E-Jobs" website for other positions, but there was nothing listed for which she was qualified [*Id*. at pp. 26, 28].

Plaintiff met with Linda Burchfield, Eastman's Human Resources Manager for the Acetate Fibers & Cellulose Esters and Specialty Plastics Divisions, on September 23, 2013, to discuss Eastman's policy for accommodating temporary activity restrictions and to discuss plaintiff's options [Doc. 16 at ¶ 8]. Plaintiff claims Ms. Burchfield told her that the only way to save her job was "to have all restrictions lifted and come back 100 percent" [Doc. 14-1 at p. 25]. Plaintiff told Ms. Burchfield she was discriminating against her and violating the ADA [*Id*. at p. 30]. During this meeting, they scheduled an appointment with Dr. Heiba in Eastman's Medical Department to review plaintiff's activity restrictions and essential job duties and to perform a Functional Capacity Evaluation ("FCE") [*Id*.]. The FCE was conducted on October 1, 2013, and Eastman received the results on October 7, 2013 [Doc. 17 at ¶ 3].

As a result of the FCE report, on October 8, 2013, Eastman Medical advised Mr. McCloud and Ms. Burchfield that plaintiff no longer had temporary restrictions, but she "may require overhead reaching assistance" [Doc. 15 at ¶ 17; Doc. 16 at ¶ 9; Doc. 17 at ¶ 4]. In fact, only the ladder climbing restriction had been removed [Doc. 14-1 at p. 16]. Based on the incorrect report that plaintiff had no restrictions, Mr. McCloud believed that plaintiff was able to return to her normal rotations and he prepared to begin her training

7

and certification on her required job rotations [Doc. 15 at ¶ 17].[3]  Mr. McCloud anticipated

that plaintiff would work in the following rotations:  Activation, Acetylation, Acetylation

Field Operator, and Precipitation, among other duties [*Id.*].

 On October 13, 2013, Mr. McCloud, Mr. Britton, and Ms. Burchfield met with

plaintiff to discuss her return to work [Doc. 15 at ¶ 19].  During this meeting, plaintiff

stated she did not believe she could perform several of her job duties [*Id.*].  Plaintiff stated

that her temporary activity restrictions were still in place and that there were job functions

she could not perform without assistance [Doc. 16 at ¶ 10].  This was contradictory to the

FCE report that Ms. Burchfield and Mr. McCloud received from Eastman Medical.  Later

that day, Mr. Britton met with plaintiff to discuss which of her job duties she could not

perform and how Eastman could accommodate her [Doc. 15 at ¶ 20].  Mr. Britton reported

to Mr. McCloud and Ms. Burchfield that there were several job duties that plaintiff told

him she simply could not perform or that she could perform only with the assistance of

others [*Id.*].

 On October 15, 2013, Eastman Medical provided modified temporary restrictions

to Mr. McCloud for plaintiff which stated, "employee needs help with functions that

require use of both hands" and that this restriction would be in place for 2 weeks [Doc. 15

at ¶ 21].  Mr. Britton and Mr. McCloud reviewed this restriction and concluded that they

could not accommodate it because, based on their personal knowledge and observations,

---

[3]Plaintiff was required to become certified, i.e., fully trained, on her required job rotations because
the process had been modified during the period since she had been injured, and she had not had
the opportunity to become certified on the other job rotations while she was off work and during
her temporary assignment to the Control Room [Doc. 15 at ¶ 18].

the First Operator essential job duties require use of both hands to complete tasks at least 20% of the time [*Id.*]. Additionally, they concluded that Eastman could not accommodate plaintiff's temporary restrictions because she admitted to Mr. Britton that there were several essential job duties that she simply could not perform without the assistance of others [*Id.*].

During this time frame, Ms. Burchfield contacted Doug Giles and Charles Chapman in Eastman's Industrial Hygiene department to determine if there was a way to accommodate plaintiff's inability to perform certain of the tasks associated with her position [Doc. 16 at ¶ 13]. Ms. Burchfield inquired if there was a device or other accommodation they could identify to assist plaintiff [*Id.*]. After reviewing the task descriptions and physically reviewing the area in which plaintiff worked, both Mr. Giles and Mr. Chapman were unable to identify a device that could assist plaintiff with all of the essential job functions she could not perform [*Id.*].

Plaintiff had exhausted her four-month period under Eastman's policy for accommodating temporary activity restrictions [Doc. 16 at ¶ 15]. Additionally, Mr. McCloud and Mr. Britton had concluded that Eastman could not accommodate her temporary activity restrictions on an ongoing basis because there were several essential job duties that she admitted she could not perform [*Id.*]. They also determined that plaintiff's activity restrictions prevented her from performing 20% of her daily tasks and Eastman could not reasonably accommodate those restrictions on an on-going basis [*Id.*]. On October 16, 2013, plaintiff met with Mr. McCloud, Mr. Britton, and Doug Bounds,

Eastman's Human Resources Team Manager, to review her status. At this point, plaintiff

had exhausted all available leave and her employment was terminated [Doc. 15 at ¶ 22].


## II.    Motion to Strike

Eastman has moved to strike [Doc. 25] plaintiff's 30-page affidavit [Doc. 23] filed

in response to the motion for summary judgment. Specifically, Eastman argues that the

affidavit is improper because it contradicts plaintiff's deposition testimony and/or contains

embellishments to her testimony; it contains hearsay and "rank speculation"; and it

contains legal arguments in an effort to evade the page limits on briefs set forth in E.D.

Tenn. L.R. 7.1(b) [Doc. 26 at pp. 2—7].

Plaintiff has filed a 25-page response [Doc. 27] to the motion to strike correctly

noting that an affidavit is not a "pleading" within the meaning of Fed. R. Civ. P. 7(a) and

therefore it is not subject to a motion to strike under Fed. R. Civ. P. 12(f).[4] *See Fox v.*

*Michigan State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006); *Vehicle Protection*

*Plus, L.L.C. v. Premier Dealer Servs., Inc.*, 650 F. Supp. 2d 800, 807 n.4 (E.D. Tenn. 2009)

(Jordan, J.). Accordingly, because plaintiff's affidavit is not a pleading subject to Rule

12(f), Eastman's motion to strike will be **DENIED**.

However, Eastman is correct that the Court must consider only admissible evidence

presented in conjunction with a motion for summary judgment. Fed. R. Civ. P. 56(c)(2)

---

[4]The Court observes that most of plaintiff's response to the motion to strike is further argument on
the issues presented by the motion for summary judgment and is inappropriate on that basis.
Plaintiff is arguably using her response to the motion to strike to get around the restrictions on
supplemental briefs provided in E.D. Tenn. L.R. 7.1(d).

("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible evidence."); *see Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment").  Eastman is also correct that a party may not create a question of fact by filing an affidavit in direct contradiction to the party's earlier sworn testimony.  *Aerel v. S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907—08 (6th Cir. 2006); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  If, however, the affidavit is not directly contradictory, the Court should not strike or disregard the affidavit unless it is "an attempt to create a sham fact issue."  *Aerel*, 448 F.3d at 908.  Thus, to the extent plaintiff's affidavit is directly contradictory to her deposition testimony or is otherwise inadmissible, the Court will not consider the affidavit.  *See United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 561 (6th Cir. 1985) ("The rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in support or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion.") (quoting *Lee v. Nat'l Life Assurance Co.*, 632 F.2d 524, 529 (5th Cir. 1980).

## III.    Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing that no genuine issues of material fact exist.  *Celotex Corp. v.*

11

*Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

12

## IV. Analysis

The ADA prohibits covered employers from discriminating against qualified individuals with a disability. 42 U.S.C. § 12112. A plaintiff may prove that she was discriminated against based on her disability either through direct or indirect evidence. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453—54 (6th Cir. 2004). Ms. Mullenix has presented no direct evidence of disability discrimination so her claims must be reviewed under the *McDonnell Douglas* burden-shifting framework. *Id*. at 452—53. To state a prima facie case of discrimination under the ADA, the plaintiff must establish that: (1) she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) the disabled individual was replaced. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016); *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). Furthermore, the plaintiff's disability must be a "but for" cause of the adverse employment action. *Tennial v. United Parcel Serv.*, No. 15-6356, 2016 WL 6156315, *7 (6th Cir. Oct. 24, 2016); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc).

The plaintiff may establish the first prong of the prima facie case if the plaintiff (1) has a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities (i.e., "actually disabled"); (2) the plaintiff has a record of such impairment; or (3) the plaintiff is regarded by an employer as having such an impairment

13

("regarded as disabled").[5] *Gruener v. Ohio Cas. Ins. Co.,* 510 F.3d 661, 664 (6th Cir. 2008) (citing *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 810 (6th Cir. 1999)) (quotations omitted); *see also* 42 U.S.C. §§ 12102(1)(A)-(C). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). While this is not meant to be a "demanding standard," 29 C.F.R. § 1630.2(j)(1)(i), the plaintiff must present more than "bare assertions" of an impairment. *See Neely v. Benchmark Fam. Servs.*, 640 F. App'x 429, 433 (6th Cir. 2016).

### A.    Whether Plaintiff was Actually Disabled

Eastman first argues that plaintiff cannot establish the first prong of a prima facie case because she was not disabled within the meaning of the ADA because her restrictions were temporary and her injured arm did not substantially limit one or more of her major life activities [Doc. 14 at pp. 13—16]. Eastman relies on the medical records indicating that plaintiff's restrictions were "temporary" [Doc. 14-1 at pp. 68, 69, 71, 73] and case law holding that restrictions which were not permanent or long-term are not regarded as "substantially limiting" under the ADA. *See, e.g., Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 371 (6th Cir. 2013); *Spence v. Donahoe*, 515 F. App'x 561, 569—570 (6th Cir. 2013). Plaintiff relies on the fact that she continued to have restrictions for 12 months following her injury and thus her impairment was not "temporary" or "minor" [Doc. 21 at

---

[5]Eastman does not dispute that plaintiff had an impairment [Doc. 26 at p. 10].

pp. 3—5]. Although some of the medical reports do state that plaintiff's restrictions were "temporary" and her condition did improve over time, it is undisputed that plaintiff still had restrictions at the time of her termination, twelve months after her injury. More importantly, the EEOC regulations following the ADA Amendments Act of 2008 instruct that "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ix). Thus, the pertinent inquiry is not whether plaintiff's restrictions were labelled "temporary" or "permanent" or the precise length of time she was under restrictions, but whether she was substantially limited in a major life activity.

Eastman argues that plaintiff has not identified any major life activities in which she is limited because the only things she cannot do is mow her lawn and yard work, which are not major life activities [Doc. 14 at pp. 15—16]. Plaintiff responds that she is limited in the major life activities of "performing manual tasks," "lifting," and "reaching" [Doc. 21 at pp. 3—4 (citing 29 C.F.R. § 1630.2(i)(1)(i))]. Eastman replies that plaintiff has presented no evidence or testimony to support this assertion [Doc. 26 at p. 9]. In other words, plaintiff's conclusory assertion that she is substantially limited in the major life activities of performing manual tasks, lifting, and reaching is not enough to survive summary judgment.

Eastman is correct that plaintiff testified that she could not mow the lawn or do yard work, but that she was able to cook, clean, wash clothes, and care for herself and her mother [Doc. 26-1 at p. 4]. She also testified that she could not perform certain job duties without assistance due to her lifting and reaching limitations [Doc. 14-1 at pp. 18—24]. At the

15

time of her termination, plaintiff was restricted to lifting no more than 10 pounds with her right arm and occasional above-shoulder reaching per Eastman's Medical evaluation [Doc. 14-1 at p. 76]. Thus, in addition to her own testimony, plaintiff has presented medical evidence regarding her limitations. *Cf. Neely*, 640 F. App'x at 435 ("self-described symptoms … without corroborating medical evidence or any diagnosis are insufficient to establish a substantial limitation on a major life activity"); *White v. City of Gatlinburg*, No. 3:14-CV-00505, 2016 WL 3093899, at *3-4 (E.D. Tenn. Jun. 1, 2016) (Reeves, J.). The Court concludes that plaintiff has presented sufficient evidence to satisfy the first prong of the prima facie case, that she was actually disabled within the meaning of the ADA.

B.    Whether Plaintiff was Regarded as Disabled

An employee is "regarded as" disabled under the ADA if his or her employer (1) mistakenly believes that the employee has a physical impairment that substantially limits one or more major life activities, or (2) mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. *Ferrari*, 826 F.3d at 893; *see* 42 U.S.C. § 12102(3)(A) ("[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual … has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity"); 29 C.F.R. § 1630.2(g)(1)(iii) ("[b]eing regarded as having such an impairment … means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory and minor'"). "Thus, an individual may fall into the definition of one regarded as having a disability if an employer

16

ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Ross v. Campbell Soup Co.,* 237 F.3d 701, 706 (6th Cir. 2001).

Eastman first notes that the "regarded as" definition of disabled does not apply to impairments that are "transitory and minor." 42 U.S.C. § 12102(3)(B). Thus, because plaintiff's restrictions were labeled as "temporary," Eastman contends they are transitory as a matter of law [Doc. 14 at pp. 16—18]. This argument falls short, however, inasmuch as the ADA explicitly states that "[a] transitory impairment is an impairment with an actual or expected duration of 6 months or less." *Id.* It is undisputed that plaintiff's restrictions, while improving over time, lasted more than six months and are therefore not "transitory" within the meaning of the ADA.

Eastman next argues that plaintiff was not "regarded as" disabled because she was not "perfectly able to perform" her job [Doc. 14 at p. 17 (quoting *Ferrari*, 826 F.3d at 892)]. Eastman notes that twelve months after her injury plaintiff admittedly still could not perform all the essential duties of her position without assistance [*Id*. at p. 18]. Thus, her termination was not the result of "myths, fears, and stereotypes regarding disabilities" [*Id*. (quoting *Neely*, 640 F. App'x at 436). Plaintiff does not dispute that she had limitations which affected her ability to perform her job, but contends that Ms. Burchfield's statement that plaintiff had to be "at 100%" in order to return to work and her email of talking points for the termination meeting is evidence that plaintiff was regarded as disabled [Doc. 21 at p. 16]. Eastman responds that Ms. Burchfield's email of talking points does not contain evidence that plaintiff was regarded as disabled, but merely provides bullet points for

17

plaintiff's managers to discuss her termination [Doc. 26 at p. 10]. Eastman also argues that, assuming Ms. Burchfield did make the "at 100%" comment, her actions nevertheless demonstrated her efforts to find a reasonable accommodation to plaintiff's activity restrictions [*Id*. at p. 11].

As noted above, a "regarded as" claim requires evidence that the employer has a mistaken perception of the employee's abilities. Taking the plaintiff's evidence as true for purposes of summary judgment, plaintiff has not shown that Eastman had a *mistaken* belief about her abilities. *See, e.g., Mahon v. Crowell*, 295 F.3d 585, 592 (6th Cir. 2002). The evidence demonstrates that Eastman had altered plaintiff's work requirements to take into account the activity limitations provided by her doctor and that plaintiff admittedly could not perform all of her job duties without assistance. This does not indicate that Eastman was wrongly viewing plaintiff through a stereotype of disability, but rather was following the specific recommendations of her doctor. *Id.*; *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664—65 (6th Cir. 2008); *see Linser v. State of Ohio, Dep't of Mental Health*, No. 99-3887, 2000 WL 1529809, at *4 (6th Cir. Oct. 6, 2000) (fact that defendants granted plaintiff's request for accommodation does not by itself establish that she was regarded as disabled); *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000) (same). "[A]wareness of an impairment is not enough to prove that the impairment was regarded as substantially limiting major life activities." *Wolfe v. U.S. Steel Corp.*, 567 F. App'x 367, 374 (6th Cir. 2014) (citing *Brady v. Potter*, 273 F. App'x 498, 503 (6th Cir. 2008)). Most importantly, plaintiff admittedly cannot show that she was "perfectly able to perform" her job. Accordingly, she cannot establish that she was regarded as disabled.

18

C.  Whether Plaintiff was Qualified to Perform the Essential Functions of Her Job With or Without Reasonable Accommodation

Eastman next argues that plaintiff cannot establish the second prong of a prima facie case because she was not qualified to perform the essential functions of her position with or without a reasonable accommodation [Doc. 14 at pp. 18—21]. Specifically, Eastman notes that the First Operator position requires several daily physical tasks which plaintiff admittedly could not perform without assistance. Eastman also recites the well-settled law that the ADA does not require an employer to accommodate an employee by shifting an essential job function onto others. *See, e.g., Meade v. AT&T Corp.*, 657 F. App'x 391, 397 (6th Cir. 2016); *Wardia v. Justice & Public Safety Cabinet Dep't of Juvenile Justice*, 509 F. App'x 527, 531 (6th Cir. 2013).

In response, plaintiff disputes that some of the job duties were essential job functions of the First Operator position and further contends that Eastman could have accommodated her restrictions. Specifically, plaintiff disputes that manipulating the 750-pound cellulose rolls in the Activation area was an essential function of the First Operator position because that rotation was assigned only to entry-level employees beginning in mid-2013 [Doc. 21 at pp. 5, 10]. In reply, Eastman contends that plaintiff has testified unequivocally that there were several functions of the First Operator position which she could not perform [Doc. 26 at pp. 12—14].

It is worth restating that, at the time of her termination, plaintiff's three rotations in the First Operator position were expected to be Acetylation Control Room, Acetylation Field Operator, and Precipitation Operator [Doc. 14-1 at p. 10; Doc. 15 at ¶ 7]. The Control

Case 2:16-cv-00004-TWP-MCLC  Document 28  Filed 02/15/17  Page 19 of 27  PageID #: 420

Room position primarily involved working with computers to control and monitor the process [Doc. 15 at ¶ 10], and there is no contention that plaintiff could not perform the essential functions of this position with or without reasonable accommodation. The Precipitation Operator "[m]ust be able to lift 30 lb. scrap dope buckets and carry down steps" [Doc. 14-1 at p. 55], which plaintiff claims she could do with her left hand [*Id*. at p. 22]. The Acetylation Field Operator position, per Eastman's job description, "opens, removes, and cleans filters and screen pots" [Doc. 14-1 at pp. 50, 54]. Plaintiff admits that she could not lift the strainer baskets or filter cages without assistance from a Utility Operator [*Id*. at pp. 19—21]. She also testified that she could open and close the strainer and filter housings as long as they were torqued appropriately [*Id*. at p. 24]. Plaintiff also agrees that the Field Operator filled in for the Activation Operator if needed [Doc. 14-1 at p. 9], and the Activation Operator position required manually manipulating cellulose rolls that weighed up to 750 pounds, something she could not do without assistance [Doc. 14-1 at pp. 17—19, 50].[6] Thus, the duties at issue are lifting the strainer baskets or filter cages and pushing the cellulose rolls and there is no dispute that plaintiff could not perform these duties *without* accommodation.

Plaintiff disputes that First Operators were required to push the cellulose rolls because this task is now performed by entry-level employees [Doc. 21 at pp. 10—11], thus arguing that this was not an essential job function. Plaintiff relies on her own affidavit, of

---

[6]Plaintiff also admitted that she could not refill the treated water lime feeder, which required lifting 50-pound bags of lime [Doc. 14-1 at pp. 22—23]. However, this appears to be a task for the Wash Room rotation which plaintiff had performed prior to her injury, but she was not expected to perform this rotation at the time of her termination [*Id*. at pp. 7, 10].

which Eastman has complained vigorously as set forth above, and the affidavit of her former co-worker Sheree Anderson [Doc. 22], of which Eastman has remained silent. Notably, Ms. Anderson states that in 2013 entry-level employees were assigned the heavy manual labor Activation area duties, including moving the 700+ pound rolls of cellulose and First Operators no longer rotated into the Activation area to do this manual labor [*Id.* at ¶¶ 11—12]. Eastman argues that plaintiff has admitted that pushing the cellulose rolls was a typical job duty of the Field Operator rotation and that she performed this task within a few months of her October 2012 injury [Doc. 26 at pp. 13—14]. Even so, Ms. Anderson's unrefuted testimony creates a question of fact as to whether the task of moving cellulose rolls remains an essential function of the job of First Operator. *See Henschel v. Clare Cty. Road Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013) ("[t]he determination of what responsibilities are essential functions is 'typically a question of fact and thus not suitable for resolution through a motion for judgment as a matter of law'") (quoting *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998)).

Further, plaintiff claims that, during a month's rotation, a First Operator was only required to clean the filters once a month, a task that took approximately 20 minutes [Doc. 14-1 at p. 20]. Ms. Anderson's affidavit confirms this description of this task [Doc. 22 at ¶ 28] and Eastman has not disputed it. Accepting this as true for purposes of summary judgment, this also presents a question of fact as to whether this task is an essential function of the First Operator position. *See Henschel*, 737 F.3d at 1022—23 (court must examine the amount of time spent performing a function to determine if it is essential or marginal) (citing 29 C.F.R. § 1630.2(n)(3)).

21

This issue comes into sharp relief when compared with Eastman's argument that plaintiff's proposed accommodation – allowing the Utility Operators to assist her with lifting the filters or moving the cellulose rolls – was not reasonable [Doc. 14 at pp. 19—21; Doc. 26 at pp. 14—18]. Assuming that these two tasks were essential functions, Eastman argues that employers are not required to accommodate individuals by shifting an essential job function onto others. This is a correct statement of the law. *See Meade*, 657 F. App'x at 397; *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000) ("the ADA does not require employers to accommodate individuals by shifting an essential job function onto others"). However, plaintiff's own testimony does not suggest that she asked for these tasks be assigned to someone else. She simply asked for someone to help her do them – "If I had assistance from a UO to help me with that, no problem" [Doc. 14-1 at pp. 19—20]. In light of the undisputed fact that Utility Operators were available at times to do just that, plaintiff's proposed accommodation does not seem unreasonable.

After considering all the evidence, the Court concludes that there are genuine issues of material fact as to whether plaintiff could have performed the essential functions of the First Operators position with reasonable accommodation. Accordingly, summary judgment will be denied on this claim.

D.     Failure to Accommodate

The ADA prohibition on discrimination "against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant

or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). In order to establish a prima facie case of a failure to accommodate claim under the ADA, "a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 407 (6th Cir. 2014) (quoting *Johnson v. Cleveland City Sch. Dist.,* 443 F. App'x 974, 982–83 (6th Cir. 2011)). Notably, "[a]n ADA plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1108 (6th Cir. 2008) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)). The employer then has the burden of persuasion to show that the proposed accommodation would impose an undue hardship. *Id*.

As noted above, there are material questions of fact in dispute as to whether plaintiff is disabled within the meaning of the Act and whether she is qualified to perform the essential functions of the position with or without reasonable accommodation. Further, relying on the same rationale as set forth above, Eastman argues that plaintiff's proposed accommodation was not reasonable, i.e., it is not reasonable to shift essential job duties to another employee [Doc. 14 at pp. 22—23; Doc. 26 at pp. 18—19]. However, as noted above, plaintiff did not ask for her essential job functions to be assigned to someone else;

23

she asked for a Utility Operator to assist her with the tasks she could not perform alone. Inasmuch as the task in dispute – cleaning the filters – only took approximately 20 minutes once a month and inasmuch as the Utility Operators are available to assist First Operators, her proposed accommodation does not seem objectively unreasonable. Moreover, Eastman has not presented undisputed evidence that this accommodation would have presented an undue hardship for the company. Accordingly, the Court finds that there are genuine issues of material fact in dispute on plaintiff's failure to accommodate claim and summary judgment will be denied on that claim.

E.    Retaliation

Plaintiff's complaint generally alleges that Eastman retaliated against her after she complained to Ms. Burchfield that Eastman was discriminating against her because of her disability [Doc. 1 at ¶ 9].[7] Eastman has argued that it is entitled to judgment as a matter of law on plaintiff's retaliation claim because there is no causal connection between plaintiff's protected activity and her termination and because Eastman had a legitimate non-discriminatory reason for terminating plaintiff's employment [Doc. 14 at pp. 23—25]. As noted in Eastman's reply brief [Doc. 26 at p. 2], plaintiff has not responded in any way in support of her retaliation claim and her failure to respond will be deemed a waiver of any

---

[7]Plaintiff's complaint alleges this conversation occurred in July 2013 [Doc. 1 at ¶ 9]. In plaintiff's interrogatory responses [Doc. 14-2 at p. 4—5], plaintiff describes the meeting with Ms. Burchfield where she complained of discrimination as occurring in "late July 2013." However, in her deposition, plaintiff testified that this meeting occurred in September 2013 after plaintiff had returned to work [Doc. 14-1 at p. 30]. In her affidavit, plaintiff states that this meeting occurred on September 23, 2013 [Doc. 23 at ¶¶ 17—18]. The Court finds that this discrepancy is not material for purposes of the instant motion.

opposition to the relief sought on this claim. *See* E.D. Tenn. L.R. 7.2. "It is well settled that the non-moving party must cite specific portions of the record in opposition to a motion for summary judgment, and that the court is not required to search the record for some piece of evidence which might stave off summary judgment." *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1191 (6th Cir. 1997). However, a court cannot grant summary judgment simply because the nonmovant has not responded. *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991); *Nelson v. City of Oliver Springs, Tenn.*, No. 3:04-CV-372, 2005 WL 1594553, at *2 (E.D. Tenn. Jul. 7, 2005) (Jordan, J.). Rather, the motion must be carefully examined to ensure that the moving party has discharged its burden of showing an absence of disputed material facts. *Id.*

Under the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a) (as quoted in *Penny v. United Parcel Serv.,* 128 F.3d 408, 417 (6th Cir. 1997)). A plaintiff need not actually be disabled to assert a claim of disability retaliation. However, the plaintiff must have a reasonable and good faith belief that the opposed act or practice is unlawful under the ADA. *Barrett v. Lucent Tech.*, 36 F. App'x 835, 840 (6th Cir. 2002). To establish a *prima facie* case of retaliation under the ADA, a plaintiff must demonstrate: (1) she engaged in protected activity; (2) her engagement in that protected activity was known to her employer; (3) her employer, thereafter, took an adverse employment action against her; and (4) a causal link exists between his engagement in the protected activity and the adverse employment action. *Clark v. City of Dublin,* 178 F. App'x 522, 525 (6th Cir. 2006)

25

(citations omitted). The only *prima facie* element challenged here, the causal connection, requires a plaintiff to produce sufficient evidence to infer that an employer would not have taken the adverse employment action had the plaintiff not engaged in a protected activity. *Barrett*, 36 F. App'x at 841. "A causal connection may be shown by direct evidence or by knowledge of the complaints on the part of the employer coupled with a closeness in time sufficient to create an inference of causation." *Id*.

Plaintiff has presented no evidence to show that her termination was causally connected to her complaint to Ms. Burchfield. Assuming for purposes of this motion that the complaint occurred on or about September 23, 2013, plaintiff's termination occurred fairly close in time. However, plaintiff has not disputed the evidence that, following their meeting, Ms. Burchfield scheduled an FCE with Dr. Heiba, that Ms. Burchfield requested further guidance from Eastman Medical as to plaintiff's ability to perform her essential job duties, or that she contacted Mr. Giles and Mr. Chapman in the Industrial Hygiene department to determine if they could identify a device or accommodation that would allow her to perform all of her essential job functions. In short, there is substantial evidence that Ms. Burchfield continued to try to find ways to keep plaintiff employed with Eastman and there is no evidence that plaintiff's complaint of discrimination made any impact on the termination decision. "Subjective beliefs, without affirmative evidence, are insufficient to establish a claim of retaliation." *Adair v. Charter Cty. of Wayne,* 452 F.3d 482, 491 (6th Cir. 2006). Accordingly, defendant is entitled to summary judgment on the ADA retaliation claim.

## V.  Conclusion

For the reasons set forth herein, defendant's motion to strike [Doc. 25] will be **DENIED** and the motion for summary judgment [Doc. 13] will be **GRANTED in part and DENIED in part**.  An appropriate order will enter.


    s/ Thomas W. Phillips                 
SENIOR UNITED STATES DISTRICT JUDGE